CAMPAU *v.* DETROIT DRIVING CLUB.[1]

1. APPEAL AND ERROR—SUBSEQUENT APPEAL—LAW OF CASE.
    On appeal from the final decree in a creditors' suit settling the
    receiver's account, and making disposition of the funds in
    his hands, a decision on a prior appeal that the court had jur-
    isdiction to appoint the receiver, that he was regularly ap-
    pointed, assumed the trust, and has since been recognized as
    the officer in charge of the property, is not conclusive of the
    complainants' good faith in instituting the suit, and their
    right to have their judgment paid out of the income of the
    property.

2. CREDITORS' SUIT—BILL—STATUTORY REQUIREMENTS.
    Strict observance of the statute (§§ 436, 437, 1 Comp. Laws) in
    framing judgment creditors' bills has always been required.

3. SAME—RECEIVER—APPOINTMENT—POWER OF COURT.
    Where the averments of a judgment creditors' bill are formally
    sufficient under the statute, the court has power to appoint
    a receiver, even in the face of denials, by the debtor, that
    any property reachable by the bill exists.

4. SAME—MANAGEMENT OF PROPERTY.
    The statute (§ 437, 1 Comp. Laws) does not authorize the court
    to turn over to the creditor of a corporation, which first asks
    permission, all of the property of the corporation, to be used
    in continuing the business of the corporation for the benefit
    of such creditor, to the exclusion of the other creditors.

5. SAME—INCOME—DISTRIBUTION OF FUND.
    Where the receiver appointed in a creditors' suit discovered no
    property of the debtor not available on execution, and it
    appears on the final hearing that complainant knew there
    was none when he filed the bill, the fund in the hands of the
    receiver on the final hearing, arising from profits in his man-
    agement of the debtor's business, will be distributed among
    creditors as though accumulated by the debtor.

6. SAME—EXPENSES OF MANAGEMENT.
    In distributing a fund derived from adventures of the receiver,
    in which the property of the debtor was used, all disburse-
    ments connected with and necessary to the conduct of the
    business engaged in should be allowed.

[1] Rehearing denied July 24, 1906.

7. SAME—DISBURSEMENTS—INTEREST AND TAXES.

Only such disbursements for interest and taxes as resulted in benefit to the fund secured for creditors should be allowed as expenses, the balance being properly chargeable as a lien upon the mortgaged realty to protect which the payments were made.

8. SAME—REPAIRS.

Disbursements for repairs upon the buildings of the debtor should be apportioned between the fund to be distributed and the realty in accordance with the benefit received by each.

9. SAME—COMPENSATION OF RECEIVER.

Where one of the complainants in a creditors' bill is appointed receiver, and the proceeding results in the discovery of no property of the debtor not available on execution, but the receiver's management of the debtor's business results profitably, giving rise to a fund available to the creditors generally, the receiver is not entitled to compensation on the ground that he has performed the duties of receiver and in fact accumulated the fund, since his appointment to the office cannot be supported upon other grounds than those asserted in the bill.

10. SAME—ATTORNEYS' FEES.

A receiver, under such circumstances, is not entitled to his disbursements to his attorneys.

Appeal from Wayne; Rohnert, J.    Submitted November 7, 1905.    (Docket No. 257.)    Decided May 24, 1906.

Creditors' bill by Daniel J. Campau, George M. Vail, and Francis F. Palms against the Detroit Driving Club, in which Fred T. Moran and Worthy L. Churchill intervened by petition: On settlement of the decree, Campau, as receiver of defendant, and as one of the complainants, and the interveners appeal.    Modified and affirmed.

*Moore & Moore* (*Otto Kirchner*, of counsel), for Campau.

*Fred A. Baker*, for interveners.

OSTRANDER, J.    The last decree of this court in this cause was made on July 1, 1904, upon appeals heard in

144 MICH.—6.

April, 1903, determined in February, 1904. An application for rehearing was denied June 18, 1904. *Campau* v. *Detroit Driving Club*, 135 Mich. 575. Pursuant to the decree then entered, the record was remanded, with directions to require the receiver to account, and, upon such accounting being made, to ascertain and determine the liens and priorities of the parties in and upon the income and earnings of the corpus of the real and personal property of the Detroit Driving Club, and the dispositions to be made of the fund. The receiver filed two accounts, one covering the period from his appointment, December 7, 1899, to October 31, 1904, the other the period from November 1, 1904, to January 31, 1905. They do not appear in the printed record, but were produced in typewritten form at the hearing. Objections to the account were filed, the receiver was examined before the referee and, pending the making of a report, by an order of the court below, the referee was directed to report the testimony taken and was discharged from further consideration of the case. The Hon. Morse Rohnert, one of the circuit judges for Wayne county, proceeded to pass upon the accounts and to determine the liens, and priorities of the parties, and on September 30, 1905, he made and filed a report which was later on, with certain changes, made the decree of the court. By the same order, the fifth petition of intervening creditors, filed July 31, 1905, was denied. From this decree, Daniel J. Campau, as receiver and as one of the complainants, and the interveners, have appealed. Interveners moved to dismiss the appeal of Daniel J. Campau, as one of the complainants, and his appeal as receiver. These motions were brought on and argued at the hearing. Since the hearing, there has been filed by the receiver a third account, for the period from February 1, 1905, to October 31, 1905. To this account the interveners filed objections and have moved this court to refer the account to a commissioner with the usual directions and to direct said commissioner, further, to take testimony and report the extent to which counsel for com-

plainants and counsel for interveners have acted as counsel for the Detroit Driving Club; that independent counsel be appointed by this court to represent the receiver on such reference and in all future proceedings in which the receiver is interested. It appears, also, that in June, 1905, and after a decree had been entered for a sale of the property of the Detroit Driving Club in foreclosure proceedings, an order was made for certain repairs to be paid for out of the income and profits, from which order intervening petitioners appealed to this court. While considerable portions of the earlier history of this case are recited in the opinions of this court in *Moran* v. *Wayne Circuit Judge*, 125 Mich. 6; *Campau* v. *Detroit Driving Club*, 130 Mich. 417, 135 Mich. 575, it is still necessary to an understanding of questions now presented that some of the facts be, as briefly as possible, restated in connection with other facts not then before the court.

The Detroit Driving Club is a corporation organized in 1893 under Act 22, Pub. Acts 1883 (chapter 211, 2 Comp. Laws), with a capital stock of $150,000, in shares of the par value of $100. Complainants are officers of the club. Mr. Campau, before and at the time of the beginning of this litigation, was its president and chief executive officer. The other complainants were, respectively, its vice president and treasurer. Before and at the time the complainants filed their bill (a judgment creditor's bill) in this cause, which was April 24, 1899, the property of the club was incumbered by a first mortgage, given to the Union Trust Company, trustee, securing the holders of bonds of the club to the amount of $75,000, and by a second mortgage, given to and owned by Daniel J. Campau, securing notes or bonds of the club to the amount of about $60,000. Complainants were also plaintiffs in an execution levied upon the real and personal property of the club. A second execution, issued upon another judgment in their favor, had been returned unsatisfied by the sheriff and was the foundation for the bill in the present case. The interveners, Moran and Churchill, are as-

signees of a judgment and of the execution levy made thereunder upon the real estate of the Detroit Driving Club. It is a part of the important history of the case that after the receiver had been appointed in this suit, the personal property upon which the first execution had been levied was, on March 29, 1900, sold by the sheriff to complainants for $1,089. The sheriff also sold upon said execution, April 3, 1900, all of the real estate to complainants for $18,692.47, and, later, returned the execution satisfied. Both of these sales were later, and on objection of the intervening creditors, set aside, and the receiver, who had relinquished possession, again assumed control of the property. By these sales, all of the property of the debtor, real and personal, excepting some accounts receivable, of doubtful value, was bid in by complainants. No proceedings have ever been taken to enforce the execution levy made by the assignor of interveners.

The bill of complaint is in the usual form; sets out the judgment, issue, and return of execution unsatisfied, negatives collusion with the debtor or any other persons, avers that the bill is not exhibited to protect the property of the debtor against the claims of other creditors, and charges that complainants have reason to believe and do believe that the debtor has equitable interests, things in action, or other property of the value of upwards of $10,000, which complainants had not been able to discover and reach by execution; that the said Detroit Driving Club has "a considerable amount of money and of legal and equitable debts, claims, and demands due to it from different persons (whose names are unknown to your orators), and that it has money and other personal property either in possession or held in trust for it, * * * the situation, value, and particulars of which are unknown to your orators." The bill is signed and verified by Daniel J. Campau and was taken as confessed December 6, 1899, and on December 7, 1899, Daniel J. Campau, one of the complainants and president of defendant, was appointed receiver. The order appointing him required the driving

club to execute, and it did execute, to him, a general assignment on oath of all its property, debts, equitable interests, etc. The receiver has used, repaired, insured the same, given race meetings at the track, paid interest on the first mortgage, and paid taxes upon the property.

It is seen from this statement that Mr. Campan is, and from the time of his appointment has been, interested in the property of this insolvent corporation as second mortgagee of the property, as a judgment creditor with a levy, as a judgment creditor seeking equitable assets through a receivership, and as receiver. This omits mention of any interest as director and president of the judgment debtor. It now appears that nothing in the way of property of the debtor has been discovered or reached in these proceedings, and that the fund which has been created has come from a continuance of the business of the debtor, using the property of the debtor under protection of the court. It further appears from his testimony and accounts that he knew exactly the situation and condition of the property of the debtor, and knew there were no assets of the kind mentioned in his bill of complaint nor any method of accumulating funds which was not available to the Detroit Driving Club, if the rights of other creditors were effectively postponed. It is stated in the brief for complainants:

"The record shows that the Detroit Driving Club grounds, standing alone, had but very little earning power, and in order to realize any earnings it was necessary, in addition to making large investments and taking great risks, to secure and retain what are called in the record 'franchises,'" etc.

In a petition to the court on December 28, 1899, the receiver set out—

"That there is a small amount of personal property, worth a few hundred dollars, but which is also incumbered for more than it is worth. Your petitioner says that the only available asset assigned to him by said defendant is the equity of said defendant in said race track, buildings and grounds. That said defendant has heretofore made

considerable sums of money by giving races on said grounds during the summer and fall of the years, and that in the opinion of your petitioner he could, as such receiver, operate said track during the calendar year 1900, and realize several thousand dollars net profit out of said operation for the benefit of the complainants herein, and to apply upon their claim."

He reported to the court, as the result of his receivership for the period ending October 31, 1904, net profits of $5,578.15; from November 1, 1904, to January 31, 1905, $5,713.75; from February 1, 1905, to October 31, 1905, $8,345.48. He has paid himself a salary at the rate of $2,500 per annum, with some additions for extra race meetings, amounting in all to $14,583.31; for interest on the first mortgage, $22,549.64; for repairs, ordinary and extraordinary, $18,790.70; for attorneys' fees, $5,415.14; for taxes, $4,521.21; for insurance, $6,661.82. The total receipts have been, $119,479.20; the total disbursements, $99,841.82. It should be further stated, in view of the decree which was made, that the real estate of the debtor has been, since the case was last in this court, sold in proceedings in chancery to foreclose the first mortgage. The details are not before us. It was stated at the hearing that $160,000 was the consideration paid at the sale.

That part of the decree below which is here important is:

"The court * * * finds that said account and each and every item thereof should be allowed except the item:

"'December 27, 1900, check to D. J. Campau for D. J. Campau, F. F. Palms, and G. M. Vail for use of personal property for one year, ending December 7, 1900, $500.'

"And excepting further, that there should be deducted from the total of $4,899.14, charged as expenses for attorney's fees and disbursements, the sum of $2,035.06, so that the amount credited to the receiver for fees and disbursements of attorneys shall be the sum of $2,864.08. These two items of $500 and $2,035.06 it was agreed by all of the parties should be disallowed.

"And excepting, further, that there should be disallowed from said account the item:

"'April 1, 1903, check to John Bornman & Son, for 32-page brief, including index, in suit of F. T. Moran and W. L. Churchill v. D. J. Campau, F. F. Palms, and G. M. Vail, $28.80.'

"And excepting, further, that the $2,250 paid for interest on July 1, 1904, the $1,002.03 paid for taxes on August 27, 1904, and the $1,026 paid for taxes on December 31, 1904, is disallowed as a charge against the income, but is allowed as a charge against and a lien upon the real property of the Detroit Driving Club next to the lien of the first mortgage as more particularly hereinafter stated, and said charge and lien is given for the purpose of reimbursing said Campau for said sums.

"The court therefore finds that the amount of cash now in the hands of the receiver is the sum of $20,361.19. That the unpaid claims against the receiver, including those disputed and those undisputed, amount to the sum of $4,407.05, which when determined shall be paid out of the income account as first claims thereon.

"In regard to the lien upon the real property of the Detroit Driving Club.

"1. The court finds that the Union Trust Company of Detroit, Michigan, as trustee for the bondholders, has a first lien upon the real estate of said Detroit Driving Club to secure bonds to the amount of $75,000, bearing interest at the rate of 6 per cent. per annum, payable semi-annually, on the 1st day of July and January of each year; that the principal secured by said mortgage matured July 1, 1904, shortly after which time said Union Trust Company instituted mortgage foreclosure proceedings, and that there was due upon said mortgage for principal, interest, and costs on the 11th day of September, 1905, the sum of $80,521.01, and that said mortgage was and is a first lien on said real estate.

"2. The court further finds that said D. J. Campau, receiver, has a lien on said real estate for interest paid on said first mortgage on July 1, 1905, to the amount of $2,250; for taxes paid on said real estate on the 27th day of August, 1904, to the amount of $1,002.03, and for taxes paid on said real estate on the 31st day of December, 1904, to the amount of $1,026, making a total of $4,278.03, which said lien is a second lien and subject only to said first mortgage.

" 3. The court further finds that said Daniel J. Campau has a mortgage upon the real property of said Detroit Driving Club to secure a debt now due him, which debt on September 11, 1905, amounted to the sum of $74,812.37, and is a third lien on said real property, subject only to the two preceding liens.

" 4. The court further finds that complainants Campau, Palms, and Vail have a lien upon the real and personal property owned by said Detroit Driving Club, which they acquired under and by virtue of an execution issued out of the circuit court for the county of Wayne against said Detroit Driving Club, and under which a levy was made on the real and personal property of said club, amounting, on the 11th day of September, 1905, to the sum of $25,498.32. And that said interveners, Moran and Churchill, have a lien upon said real and personal property which they acquired under and by virtue of a levy made thereon by the People's Savings Bank and assigned to them, which said lien amounted, on the 11th day of September, 1905, to the sum of $18,758.64.

" 5. The court further finds that said two last-mentioned liens are simultaneous liens on the real and personal property of said Detroit Driving Club.

" 6. In regard to the liens on the income, rents, and profits, the court further finds that the complainants Campau, Palms, and Vail secured, by virtue of their judgment creditors' proceedings, a prior lien on the income, rents, and profits derived from the property of the Detroit Driving Club while in the hands of the receiver, for the amount of the judgment upon which said judgment creditors' bill was filed, and that said judgment on September 11, 1905, for principal, interest and costs amounted to the sum of $14,342.24.

" 7. The court further finds that there are no other specific liens on said income, rents, and profits, but that any surplus remaining in the hands of the receiver shall be distributed pro rata among all the creditors of said Detroit Driving Club, unsecured and secured, as far as they have not been otherwise satisfied, and that the testimony shows that there are some claims now existing against said Detroit Driving Club which are not before this court, but that the parties holding said claims should have a reasonable opportunity to appear and ask for their pro rata share, if any, of said surplus."

The fifth intervening petition of interveners asked the court to find:

"1. That Daniel J. Campau, as receiver, has the first lien on the corpus of the real and personal estate of the Detroit Driving Club after and subject to the first mortgage for the amounts paid by him for interest on said first mortgage, and for taxes, insurance, and repairs, amounting in the aggregate to the sum of $47,347.69.

"2. That the intervening petitioners are entitled to be subrogated to said lien to the amount of the judgment against the Detroit Driving Club held by them, the same amounting July 1, 1905, to $19,500.60.

"3. That the real and personal property of the Detroit Driving Club be sold free and clear of all liens and incumbrances, except said first mortgage, for the purpose of satisfying and paying your petitioners the amount due on their said judgment.

"4. That the proceeds of such sale may be ordered paid into court to abide the result of the issue joined on your petitioners' third intervening petition now pending before Hon. Morse Rohnert, circuit judge.

"5. That the sale of said Detroit Driving Club's title and right to redeem may be made with all convenient speed, so that the purchaser's title thereto will be complete and perfect before said right to redeem expires."

The exceptions filed by interveners to the report, which embody their objections to the decree, allege error as follows:

"1. In finding that the original and supplementary accounts of Daniel J. Campau, as receiver, should be allowed, except the items disallowed in said report.

"2. In finding that the unpaid claims against the receiver, including those disputed and those undisputed, amount to the sum of $4,407.05; and in finding that said claims, when determined, should be paid out of the income, as first claims thereon.

"3. In finding and reporting that the Union Trust Company of Detroit, as trustee for bondholders, has a first lien upon the real estate of the Detroit Driving Club to secure bonds to the amount of $75,000, and that the amount due upon the mortgage and bonds held by said Union Trust Company on the 11th day of September, 1905, was the sum of $80,521.01. The ground of this ob-

jection is that the matter of said lien is not covered by, and is not within, the order of reference under which the learned circuit judge was proceeding.

"4. In finding that Daniel J. Campau, as receiver, has a lien on the real estate of the Detroit Driving Club for the interest paid by him on the first mortgage on the 1st day of July, 1904, to the amount of $2,250; for taxes paid on the real estate on the 27th of August, 1904, to the amount of $1,002.03, and for taxes paid on said real estate on the 31st day of December, 1904, to the amount of $1,026, making a total of $4,278.03. The ground of this exception is that the receiver should also have been given a lien for the payments of interest on the first mortgage previously made by him, as receiver, as shown by his account, and for the taxes previously paid by him, as so shown, and for the insurance premiums previously paid by him, as so shown, and for repairs to real estate made by him, as receiver, as so shown. The items which should have been added to the said receiver's lien are as follows:

| | |
|---|---:|
| Interest on the first mortgage | $20,307 20 |
| Taxes on real estate | 1,933 89 |
| Special taxes on real estate | 559 28 |
| Insurance | 5,768 55 |
| Repairs to real estate | 14,508 29 |
| | $43,077 21 |

—which amount, added to the lien found and reported by the circuit judge, makes the total amount for which the receiver should have been given a lien on the corpus of the estate, subject only to the first mortgage, the sum of $47,355.24. On any possible view of the case, the circuit judge should have added to said receiver's lien the lien of $17,546.04, fixed by the report of Commissioner May of August 6, 1902, as confirmed by Judge Carpenter's decree of November 5, 1902.

"5. In finding and reporting that Daniel J. Campau has a mortgage upon the real estate of the Detroit Driving Club, upon which there was due September 11, 1905, the sum of $74,812.37, and that said mortgage is the third lien on said real property, subject only to the two preceding liens.

"6. In finding that the complainants Campau, Palms, and Vail have a lien upon the real and personal property of the Detroit Driving Club, which they acquired under and by virtue of an execution issued out of the circuit

court for the county of Wayne against said Detroit Driving Club, and under which a levy was made on the real and personal property of said club, amounting, on the 11th day of September, 1905, to the sum of $25,498.32; and that the interveners, Moran and Churchill, have a lien on said real and personal property, which they acquired under and by virtue of a levy made thereon by the People's Savings Bank and assigned to them, which said lien amounted, on the 11th day of September, 1905, to the sum of $18,758.64, and that said judgment liens are simultaneous on the real and personal property of the Detroit Driving Club. One ground of this exception is that the matter of said judgment and execution liens is not covered by, and is not within, the order of reference of August 26, 1904. Another ground is that the amount due upon said execution levies and liens is not correctly found and stated in said report.

"7. In finding that Campau, Palms, and Vail secured, by virtue of their judgment creditors' proceedings, a prior and first and paramount lien on the income, rents, and profits derived from the property of the Detroit Driving Club while in the hands of the receiver for the amount of the judgment upon which their judgment creditors' bill was filed, and that said judgment, on the 11th of September, 1905, for principal, and interest, and costs, amounted to the sum of $14,342.24. The grounds of this exception are that Campau, Palms, and Vail acquired no such lien, and that the amount due upon their said judgment is not accurately ascertained and determined.

"8. In finding that there are no other specific liens on said income, rents, and profits, but that any surplus remaining in the hands of the receiver shall be distributed pro rata among all the creditors of said Detroit Driving Club, unsecured and secured, as far as they have not been otherwise satisfied, and that the testimony shows that there are some claims now existing against said Detroit Driving Club which were not before this court, and that the parties holding said claims should have a reasonable opportunity to appear and ask for their pro rata share, if any, of said surplus. The grounds of this exception are that the intervening petitioners in virtue of the writs of garnishment sued out by them, and their third and fourth intervening petitions in this cause, did acquire a first lien upon the income, earnings, rents, and profits of the corpus of the real and personal property of the Detroit Driv-

ing Club while in the hands of the receiver for the amount of the judgment held by them, and if they did not acquire a first lien upon said income, earnings, rents, and profits, they did acquire a second lien thereon, the same being subject to the lien alleged to have been acquired by the complainants in virtue of their judgment creditors' bill, and that under said creditors' bill, the court had no jurisdiction or power to make a general distribution of the estate and assets of the Detroit Driving Club among its creditors.

" 9. In overruling the objections to the accounts of the receiver, filed by the intervening petitioners on the 11th day of March, 1905, and in overruling each and every of said objections. The intervening petitioners claim the benefit of said objections the same as if they were here repeated.

" 10. In refusing to make, sign, and file the report proposed and submitted by the intervening petitioners to the circuit court commissioner, and to the circuit judge; and in refusing to disallow each and every of the items claimed by the intervening petitioners in their said proposed report as not properly or legally allowable. The intervening petitioners claim the benefit of their said proposed report, as showing the items in the receiver's account, which they claim should be disallowed the same as if said items were here repeated.

" 11. In refusing to hold that Daniel J. Campau, as receiver, is chargeable with the amounts paid out by him as president and manager of the Detroit Driving Club in the year 1899, and before he was appointed receiver, namely : Interest on the $18,000 note of Campau, Palms, and Vail, paid April 22, August 14, and December 1, 1899, amounting to $1,149; and for the payment made by him November 29, 1899, a few days before he was appointed receiver, on an alleged claim of the old driving club, of $914. Both of these items, aggregating $2,063, the intervening petitioners claim should be added to the amount of moneys chargeable to the receiver.

" 12. In allowing, as properly payable out of the income and earnings account, the interest paid by the receiver on the first mortgage for 4½ years, commencing January 1, 1900, and ending January 1, 1904, being nine semi-annual payments of $2,250 each, aggregating $20,250.

" 13. In allowing, as properly payable out of the income, the item of $39.38, as interest paid to D. J. Campau

for advancing an installment on interest on the first mortgage.

"14. In allowing, as properly payable out of the income account, the taxes on the real estate of the Detroit Driving Club for the years 1900 to 1903, inclusive, as follows:

| | |
|---|---:|
| 1900 | $140 00 |
| 1901 | 533 54 |
| 1902 | 402 98 |
| 1903 | 856 97 |
| Special tax in 1904 of the village of Fairview | 559 28 |
| | $2,492 77 |

"15. In allowing, as properly payable out of the income account, the insurance premiums paid by the receiver for insuring the buildings constituting part of the real estate of the Detroit Driving Club, said payments, by years, being as follows:

| | |
|---|---:|
| 1900 | $1,205 64 |
| 1901 | 1,266 39 |
| 1902 | 1,155 06 |
| 1903 | 914 33 |
| 1904 | 1,227 13 |
| | $5,768 55 |

"16. In allowing, as properly payable out of the income account, the disbursements made by the receiver for repairs to the buildings and real estate of the Detroit Driving Club, said payments, by years, being as follows:

| | |
|---|---:|
| 1900 | $683 02 |
| 1901 | 2,288 22 |
| 1902 | 2,652 43 |
| 1903 | 593 73 |
| 1904 | 1,203 07 |
| 1904 Drain | 1,271 41 |
| 1904 Extraordinary | 5,477 65 |
| 1905 | 398 76 |
| | $14,508 29 |

"And in ruling that the income account was chargeable with more than 10 per cent. a year during the continuance of the receivership for the use of the repairs made by the receiver, and in refusing to reduce the repair account

chargeable to the income account to the sum of $4,411.30.

"17. In refusing to disallow, and in allowing the payments made by the receiver to himself for his salary at the rate of $2,500 a year, said payments, as shown by the receiver's accounts, amounting to the sum of $12,708.31; and in allowing the additional salary paid by the receiver to himself August 10, 1903, of $600.

"18. In allowing the disbursements made by the receiver to Otto Kirchner and to Moore & Moore, the solicitors for the complainants, for their professional services, as shown by the receiver's accounts, the same amounting to $4,899.14, and in refusing to disallow the whole of the attorney's fees account of the receiver, except the payment to Bowen, Douglas, Whiting & Murfin, October 9, of $10.

"19. In allowing, as properly payable out of the income account, the payment made by the receiver June 18, 1904, of $1,000 for initiation fee and annual dues in 1904 in the grand circuit.

"20. In refusing to disallow the disbursements made by the receiver for his traveling expenses outside of the State, as shown by his accounts, as follows:

1900.

March 7.  Check to D. J. Campau for expenses to New York, attending meeting of Nat'l Trott. Ass'n......... $55 00

1902.

Jan. 6.  Check to D. J. Campau for expenses attending joint rules meeting in New York of Nat'l and Amer. Trott. Ass'n............................... 60 00

1903.

Feb. 18.  Check to D. J. Campau for expenses to Boston and New York and return, Jan. 26, '03, meeting of stewards in Boston and soliciting entries in New York..................................... 128 30

Expenses to New York in Feb., 1902, meeting called by Mr. Hanna at Cleveland..................... 75 00

1904.

Feb. 13.  Check to D. J. Campau, for R. R. fare to St. Louis to New York and return to Detroit....................................$48 50

Hotel bills........ .......... ............ 68 00

Incidental expenses.... ........ ......... 25 00
                                        ——— 141 50

Dec. 31.  To D. J. Campau, Dec. 6, expenses to Chicago and return, attending meet. Amer. Trott. Ass'n..... 33 50

Dec. 12.  For expenses to N. Y. and return attending meet-

|  | ing stewards Grand Circuit | $68 00 |
|---|---|---|
| Jan. 20. | Check to D. J. Campau, for expenses to New York and return attending meeting of stewards of Grand Circuit | 67 00 |
|  |  | $628 20 |

" 21. In allowing the receiver the amounts disbursed by him for entertainments as shown by his accounts, as follows:

1900.

| June 31. | Wine cards, $26.70; cigars, $5.00—Hotel Cadillac in full of acct. rendered | | $31 70 |
|---|---|---|---|
| June 27. | Check to D. J. Campau, for amt. advanced for theater tickets for entertainment of stewards Grand Cir. meet | $15 00 | |
|  | For sundry expenses | 6 00 | |
|  |  |  | 21 00 |
| Aug. 16. | Check to D. O. L. for 12 passenger brakes to races and 10 passenger brakes to waterworks | | 15 00 |

1901.

| Mar. 20. | Check to Hotel Cadillac acct. rendered for entertainment of stewards of Grand Circuit, dinner, etc. | | 78 33 |
|---|---|---|---|

1902.

| Feb. 15. | Check to Hotel Cadillac acct. rendered for entertainment stewards of Grand Circuit | | 54 10 |
|---|---|---|---|
| July 22. | Check to Hotel Cadillac for entertaining guests and officials | $17 50 | |
|  | Carriage hire | 11 00 | |
|  |  |  | 28 50 |
| June 27. | Check to D. O. L. carriage | $1 00 | |
|  | 12 passenger brakes | 10 00 | |
|  | 12 passenger brakes | 10 00 | |
|  | 12 passenger brakes | 10 00 | |
|  |  |  | 31 00 |

1904.

| Aug. 6. | Check to Swan & Norton, for refreshments, sandwiches, beer, lemonade, cigars, etc. | | 81 30 |
|---|---|---|---|
|  |  |  | $340 93 |

" 22. In allowing the payments made by the receiver for work in the construction and repairing of drains at the Detroit Driving Club, as included by the receiver in his expense accounts, as follows:

1904.

Oct. 31.  To amount of drain acct. transferred _____$1,271 41
Nov. 5.   Check to W. E. Ellair, for pay roll, working on
              drain from Oct. 28 to Nov. 4, inclusive_____   98 65
Nov. 19.  Check to W. E. Ellair, for pay roll, two weeks,
              from Nov. 4 to Nov. 18_____  196 00
Nov. 28.  Check to W. E. Ellair, for pay roll for work on
              drain, Nov. 19 to 28 _____  121 80
Dec. 13.  To Luke Crossley, for bal. due for work super-
              intending the construction and repairing drain
              at Det. Driv. Club track grounds_____  122 50

                                                          $1,810 36

"23. In refusing to make the finding of facts submitted by the intervening petitioners in the report proposed by them.

"24. In refusing to make the rulings and conclusions of law requested by the intervening petitioners, in their said proposed report, Nos. 1 to 5 inclusive, and in refusing each one of said conclusions or rulings.

"25. In allowing the payments made by the receiver to the Pinkerton National Detective Agency, as follows:

1900 _____ $341 20
1901 _____   372 62
1902 _____   499 00
1903 _____   818 25
1904 _____   396 00

                                               $2,627 07

"26. In not finding and stating the aggregate amount of the receipts of the receiver, and the aggregate amount of the disbursements allowed, so as to show the correct amount in the hands and due from the receiver."

The provision of the decree which is challenged by the appeals of Mr. Campau is found in paragraph 2. The appealing interveners challenge, as the exceptions which have been set out show, the theory upon which the accounting proceeded and, substantially, all the conclusions arrived at in the court below. The various contentions which are made will be better understood if the theories of the parties and of the trial court are contrasted. The accounting proceeded, and the decree is made precisely as though the

receiver had been appointed in a proceeding instituted under the general jurisdiction and powers of a court of equity, as though he was himself neutral and had managed an estate or created and safeguarded a fund for the use and benefit of another; with the exception that complainants are declared, in the decree, to have a first lien upon the fund. If this general theory was supported by the facts, the appeal of the receiver would not have been taken, nor would that of Mr. Campau, as one of the complainants. The receiver has been allowed all of his disbursements, including his compensation. Mr. Campau, as a complainant, will, if the decree stands, realize, with the other complainants, the principal and interest of the judgment upon which this proceeding is founded.

It is the theory of counsel for interveners that this proceeding, which is in some respects, at least, a special and statutory one, was fraudulently and collusively instituted; that a judgment creditor cannot by means of a judgment creditors' bill reach rents and profits of the real estate of his debtor when title to such real estate, at the time execution is issued and returned, to the knowledge of the creditor, stands of record in the debtor and there is no obstacle to a levy and sale by virtue of the execution; in any event, that the judgment creditor in this case secured no more than a first lien upon the income; interveners secured a second lien by the filing of their third intervening petition and are entitled to have their judgment paid out of income without any diminution of the fund to pay interest upon the first mortgage, for taxes, insurance, and repairs; that Campau, as receiver, has a first lien upon the proceeds of the sale of the property on the foreclosure of the first mortgage, after satisfaction of that mortgage, for all disbursements for interest on said mortgage, for taxes, insurance, and repairs, and that interveners are entitled to be subrogated to such receiver's lien. It is strongly urged that the facts require the court to find that the bill was collusively filed and the execution returned unsatisfied by direction of the attorneys for plaintiffs; that,

144 MICH.—7.

as a result, the receiver should be paid no compensation; the disbursements made to his counsel not approved. Certain items in the account are attacked, and it is sought to surcharge the receipts reported to the amount of $2,063. We may dismiss this last matter from further consideration by saying that we do not find that the money came to the possession of the receiver.

In reply to the other contentions of interveners, it is asserted by complainant that the status of the receiver, the good faith of complainants in instituting this proceeding, and the right of complainants to have their judgment first paid out of the income, have all been heretofore determined, against the objections now made, by this court. Examination of the various records presented to this court and of the opinions and decrees of this and of the trial court does not show these assertions to be warranted, beyond this, that the jurisdiction of the court to make the appointment of a receiver, the facts that Mr. Campau was regularly appointed, assumed the position, and has been since recognized as the officer having charge of the property, are not open to question. There is language used in the opinion in 135 Mich. 575, at page 578, which affords some basis for the argument that the other questions now raised, save only the question of the right to pay certain items from the income fund, are res adjudicata. But, read in connection with the context, and the decree of this court made thereafter and after a motion for rehearing had been heard, it is clear that the points had not been decided when the decree now appealed from was made. If it were less clear, previous decisions having been made before any account had been filed by the receiver, and upon records much less complete than the one now presented, we should be inclined to hold that the court was not precluded from now examining the whole matter upon the merits. We do not, however, base any conclusion we have reached upon the fact that the bill in this case was collusively filed. We do treat the fact that complainants had exact knowledge of the property of defendant

and that all of it could be reached in proceedings at law as important. The complainants have discovered by this proceeding no property of the debtor. This fact is now for the first time, in this court, conclusively established. It further appears that they had no expectation of discovering any property, and from the beginning designed to continue, through the receiver, the business of the debtor corporation. It would be presumed from the bill and from what was done that they designed to acquire the title to the property by means of the execution sales, and, meantime, to conduct by the receiver the usual race meetings upon the property, securing the avails of the season of 1900 for themselves. Because the sales to themselves, on execution, were considered to have been void for the reason that the property was in custodia legis and no permission to sell had been obtained, they failed to secure title to the property. The receiver thereupon resumed possession and has continued to hold race meetings until and during the season of 1905. There is no money in the fund which the receiver holds not derived, directly or indirectly, from the continuance of the debtor's business, using its property.

The statute (1 Comp. Laws, §§ 436, 437) prescribes the conditions warranting the institution of a proceeding like this one. Strict observance of the statute in the framing of the bill has uniformly been required. *Thayer* v. *Swift*, Har. Ch. (Mich.) 430; *Smith* v. *Thompson*, Walk. Ch. (Mich.) 1; *Beach* v. *White*, Walk. Ch. (Mich.) 496; *First National Bank* v. *Dwight*, 83 Mich. 189; *Vanderpool* v. *Notley*, 71 Mich. 422; *McCullough* v. *Day*, 45 Mich. 554. The bill being formally sufficient, the power of the court to proceed to appoint a receiver, even in the face of denials, by the debtor, that any property reachable by the bill existed, has been many times asserted. *Turnbull* v. *Lumber Co.*, 55 Mich. 387, and cases cited in the opinion. In support of the exercise of such power, it is said that if the denial ultimately prove true, the complainant has proceeded at the peril of being

obliged to pay costs. *Bloodgood* v. *Clark*, 4 Paige (N. Y.), 574; *Fitzburgh* v. *Everingham*, 6 Paige (N. Y.), 29; *Turnbull* v. *Lumber Co.*, supra. The statute (1 Comp. Laws, § 437) recites (whether or not it confers, or limits) the power "to decree satisfaction of the amount remaining due on such judgment, out of any property, money, or other things in action belonging to the defendant, or held in trust for him, * * * which shall be discovered by proceedings in chancery, whether the same were originally liable to be taken in execution at law or not." No authority has been presented, and it is likely that none can be found, supporting the proposition that, under the provisions of the statute quoted, a court of chancery may properly turn over to that creditor of a corporation which first asks permission all of the property of the corporation, to be used in continuing the business of the corporation for the benefit of such creditor, to the exclusion of other creditors. It was held in New York (*Farnham* v. *Campbell*, 10 Paige [N. Y.], 598 [1844]) that a judgment creditor, after exhausting his remedy at law, might file his bill to obtain satisfaction of his debt out of any beneficial interest of his debtor in real property which could not be reached by execution at law, and that such a bill being filed, the judgment creditor might obtain satisfaction out of rents and profits of real estate accruing during the 15 months allowed by law to redeem from a sheriff's sale on execution. The report does not disclose the nature of the rents and profits accruing. Whatever may be said of this case as authority (see *Congden* v. *Lee*, 3 Edw. Ch. [N. Y.] 304), it does not meet the facts here. Whether complainants believed, or were advised, that in such a proceeding the business of the debtor might be conducted by a receiver and if a profit was realized used in payment of their judgment, or whether they intended an abuse of the process and powers of the court, the result is the same. In the view we have taken of the matter, neither complainants nor the interveners have any lien upon the fund. It

should be distributed, and the court having jurisdiction over the receiver and the property will order it to be distributed, to creditors of the judgment debtor, as though it had been accumulated by the debtor. Applying these conclusions to the account of the receiver, we are able, with no particular difficulty, to dispose of all the controversies. The fund in question having been derived from adventures of the receiver, in which the property of the debtor was used, all disbursements connected with and necessary to the conduct of the business engaged in should be allowed.

The question whether the moneys disbursed to pay interest upon the first mortgage, and to pay taxes and insurance premiums, should be charged to the income, has been at all previous hearings expressly reserved. The decree below allows such disbursements as proper charges to the income fund, with the exception of the last payment of interest and the last two payments of taxes. For these, the receiver is given a lien upon the proceeds of the sale in the foreclosure proceedings. The reason for this is that no benefit to the fund resulted from such payments. Payment of the interest was authorized to be made upon condition that foreclosure of the first mortgage was deferred. It was paid without securing such postponement. The taxes, also, were paid when their payment could in no way increase the fund. It may be said of all other payments for interest, taxes, and for insurance, that probably nonpayment of them would have resulted in diminishing the fund. Some of the payments were expressly ordered by the court below. The theory upon which we appropriate the fund warrants affirmance, in this respect, of the decree.

As to the disbursements for repairs, for attorney's fees, and for the salary of the receiver, entirely different considerations are presented. It is true that it may be, and perhaps ought to be, assumed that the court below was informed concerning the various interests which Mr. Campau had in the property in question. The interest,

and we must presume the inclination, of the receiver, favored the collection of the largest possible sum upon his own mortgage. Measured in dollars, it was his most considerable interest. It is not possible to now ascertain the extent that expenditures upon the property might have been reduced with production of the same income. It is not possible to estimate, accurately, to what extent the price received on the sale, upon foreclosure of the first mortgage, was augmented by the betterments made by the receiver. From the account, it appears there was disbursed for repairs, ordinary and extraordinary, in 1900, $683.02; in 1901, $2,288.22; in 1902, $2,652.43; in 1903, $593.73; in 1904, $1,203.07, $1,271.41, and $5,417.65; in 1905, $4,681.17. We are asked by counsel for interveners to determine that the repairs made would last, on the average, 10 years; were an enhancement of the value of the property, primarily payable out of the proceeds of the sale on the first mortgage, but that 10 per cent. per annum of the cost thereof should be charged to the income fund. We are not advised as to the time when the bill was filed to foreclose the first mortgage. We are advised that on June 24, 1905, a decree of foreclosure had been entered. It has already been stated that a payment of interest, made July 1, 1904, and of taxes, made August 27, 1904, were regarded by the trial court as not properly chargeable to the income account. It appears that in 1904, previous to a race meeting which began in July, the pumping station on the grounds was burned. Pumping apparatus, of considerable capacity, is, by the testimony, shown to be necessary to get rid of water and permit the race track to be used. The record also discloses that an order was made by the court, upon a petition of the receiver, giving permission to rebuild the pumping station at an expense not exceeding $3,000, and that the question whether the cost should be paid out of rents and profits or out of the corpus of the property was expressly reserved. The cost of rebuilding was more than $5,000, was paid out of the income, and has been allowed in the

decree as a proper charge to that account. The order of June 24, 1905, permitting repairs to be made, directed that one-third of the cost of a new slate roof for the grand stand be refunded to the receiver out of the surplus of the proceeds of the sale on the first mortgage, the whole cost to be paid in the first instance out of the income. Although interveners appealed from the order last mentioned, the record does not contain the testimony upon which the court proceeded. An examination of the voluminous account of the receiver and of the testimony which is returned has not convinced us that we should do more with respect to the account for repairs than this: Allow the receiver's account for repairs as presented, except the expenditures in 1904 for a pumping station, and in 1905 for the cost of a roof for the grand stand. As to the cost of the pumping station, testimony must be taken concerning the life of the plant as installed, and a proper annual charge, proportioned to the cost and the life of the plant, will be allowed as a disbursement from the income fund for the years 1904 and 1905. The remainder of the cost of said plant will be allowed to the receiver as a lien upon the surplus produced upon the foreclosure sale. As to the roof for the grand stand, the apparently permanent character of the improvement impresses us as requiring that a smaller proportion than two-thirds of its cost should be charged to the income account. In form, the decree as to this item will be reversed, and, upon remand of the record, a new reference will be made with regard to this item, to be finally disposed of upon the same theory as is above applied to the account for the pumping station.

The receiver should be allowed no compensation. One reason for this ruling is that he has discovered no property of the debtor nor reached any assets properly reachable in a judgment creditors' proceeding. To the argument that he has performed the duties of a receiver and has, in fact, accumulated a fund for distribution to creditors, it is replied that he cannot be permitted to support his appointment to the office nor enlarge the duties of the

office upon any theory of the jurisdiction and power of the court other than the one asserted in the bill of complaint. He was not appointed to manage the business of the debtor and to accumulate, by such management, a fund for creditors. He has, it is true, applied for and obtained permission of court to conduct some of the race meetings. If we were required to consider the effect of such orders, we should be compelled to find (and this is a further reason for refusing him compensation) that his purpose in continuing the receivership, in securing such permission, and in conducting such business, was not to accumulate a fund for creditors, nor, primarily, to secure a fund out of which to pay the judgment upon which his suit is founded, but that it was to preserve, keep in condition and repair, the property of the debtor, maintain the standing and reputation of the property of the debtor as a place for race meetings, postpone the foreclosure of the senior security as long as possible and produce, when enforcement of that security occurred, the largest possible sum. As early as the month of March, 1900, in a pleading filed in the cause, the receiver asserted upon oath that "the net result of the club's business during the last four years was a loss. He denies that during the last four years the gross receipts of the club exceeded the operating expenses and fixed charges." At the end of five years, during which the receiver continued to defend his official position in the courts, he reported to the court, as the net results of his stewardship, assets of $10,991.68 and liabilities of $5,413.53. That this was not the net result or the result most desired and sought is conclusively established. From the brief of counsel for the receiver, we take the following statement of the gross and the net receipts of different race meetings:

1900 Gross receipts___$55,404 00  Net receipts _____$13,192 48
1901   "      "     ___ 67,911 55   "     "    _____ 17,150 44
1902   "      "     ___ 57,035 85   "     "    _____ 13,210 55
1903   "      "     ___ 63,332 93   "     "    _____ 16,421 88
1904   "      "     ___ 61,956 50   "     "    _____ 18,104 67

Jockey Club Meeting.

1903 Gross receipts___$45,381 00  Net receipts_____ $1,479 35

It is impossible to escape the conclusion that out of the business conducted the receiver might have early paid the judgment by virtue of which he secured his appointment, if his single purpose was so to do. The reasons for denying compensation to the receiver are controlling with respect to the disbursements made to his attorneys. They are disallowed.

As to all other matters in the account, the action of the court below is affirmed. A decree will be entered in this court in accordance with this opinion, which shall, also, in terms, operate to abate and discontinue all pending petitions, suits in garnishment, and other proceedings, seeking directions for the disposition of the fund and payment therefrom. The record will be remanded, with directions to refer the account to a master for a restatement thereof in accordance with this opinion and the testimony by this opinion and by the decree below required to be taken. Upon the settlement of the decree of this court, upon the hearing before the commissioner and final hearing in the court below, the receiver will be permitted to employ counsel, whose reasonable charges shall be paid out of the fund in the receiver's hands. And upon the coming in and confirmation of the master's report, a decree will be entered distributing the fund among the creditors of the Detroit Driving Club, as their interests may appear, but without preferences. For this purpose, the second mortgagee shall be treated as a creditor if the proceeds of the sale of property on the first mortgage shall be insufficient to discharge his lien, but to the extent only of the balance remaining after application of such proceeds. Interveners will recover from Mr. Campau the costs of this appeal.

McALVAY, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.